[Crim. No. 3695. Fourth Dist., Div. Two. May 6, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN SMALL, Defendant and Appellant.

350

## COUNSEL

James M. Wortz, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, Acting P. J.**—Convicted by jury of the second degree murder of his wife (Pen. Code, § 187), and sentenced to state prison, defendant appeals.

The defendant and the victim had been married for 20 years and had four children. Their Riverside residence was the scene of considerable marital discord, marked by frequent disputes over the disciplining and upbringing of the children. Defendant inflicted physical abuse upon his wife in several instances. On one occasion, he hit her with the barrel of a shotgun; on another, he kicked her in the lower abdomen, necessitating medical treatment. His conduct towards her resulted in intermittent separations. In September 1968 the wife and the four children left the home for a week, but she and the youngest child, Jimmy, a 14-year-old invalid, returned to the home shortly before she met her death.

At 7:30 a.m. on October 8, defendant called his 19-year-old son,

Richard, requested that he get his sister Karen and that both youngsters come to the home. Inasmuch as Karen had already left for school, Richard went to the family home alone. He arrived about 8 a.m. Defendant answered the door. He appeared to Richard to be in need of sleep as his eyes were bloodshot. At the time of Richard's arrival, defendant was drinking a can of beer. The crippled boy, Jimmy, was in the front room.

The defendant told Richard that a TV set was in a repair shop and that Richard could have it if he paid the repair bill. He said that it was going to be a "rough day" and that ". . . it was kind of a mess," but did not explain what he meant nor did he mention the wife or her whereabouts. Richard informed the father that Karen was in school, and defendant replied, "We will have to get her out." Defendant telephoned Karen's school and instructed the school authorities to send her home.

After a few minutes had passed, defendant stated that he could not wait any longer. He added, "I am sorry, the police will be here pretty soon and you read the note on the [kitchen] table and do what it says."

After defendant left, Richard went into the kitchen and found the following note:

"Karen, take care of Jimmy as best you can. All three decide together what's best for him.

"Rick, get rid of the dogs any way you see fit. Pick up my tool box and sell them. [*Sic.*]

"The Chevy will be at the police station. Take Mike down and get it. It's his if he wants it.

"Call Grandmother Small 1-813-293-6524 for advice and help."

At about 8:30 a.m. the defendant appeared at the Riverside police station and stated, "I want to report a homicide." The sergeant on duty inquired as to the location, and the defendant gave him the address. The sergeant asked defendant for his name and address and asked if anyone else knew of the homicide, and the defendant said, "No." The sergeant asked if anyone else was at the address, and defendant replied, "No," but added that his son was on his way to the home. The sergeant advised the dispatch officer to send someone to the home immediately. He then returned to the counter, advised defendant of his constitutional rights, and turned him over to another officer who asked him if he wanted to talk. Defendant replied, "I wanted to report it, but I thought it was—thought it was right. It's all I'll say. I wouldn't have come here otherwise." There was no further interrogation at that time.

Two officers arrived at the home about 9 a.m., asked Richard what

was the matter, and the youngster replied he did not know, perhaps his father's note would be of some assistance in explaining the situation. He took the officers into the kitchen and gave them the note. One of the officers asked Richard if he knew where his mother was, and Richard replied that he thought she was in the master bedroom, and directed the officers there. When they opened the door, they found Mrs. Small lying face-up on the bed.

A third officer arrived and tried unsuccessfully to obtain a pulse by placing two or three fingers on her neck. Another officer also tried to detect a pulse. He placed the ends of three fingers on the right of the neck under the jaw and thought he detected a slight pulse beat. He called for an ambulance and one arrived within four to five minutes. However, she was pronounced dead on arrival at the hospital.

Investigation of the scene revealed a spot of blood on a napkin under a chair next to the bed. The kitchen waste basket contained a dozen empty beer cans, together with some soiled Kleenex tissues; the tissues at the bottom of the basket were unstained, but à few near the top were tainted with human blood.

The victim met her death in the family home between 10 p.m. on October 7, 1968, and 4 a.m. on October 8, 1968. The cause of death was asphyxiation due to mechanical external obstruction of the upper air passages. Death was not self-inflicted. Death evidently resulted from something being placed over her nose and mouth. A large number of pinpoint hemorrhages throughout the body [petechia] demonstrated the lack of oxygen. Discoloration of the skin was noted on several parts of the body. There were bruise areas on the left side of the neck and on the right side of the middle neck. The nose was bent and there was some dry blood in the nostrils, indicating that the body had been face-down for some period of time.

The body was first examined by a pathologist at 9:50 a.m. on October 8, and reexamined at the mortuary on October 9 and 10. The bruises on the neck were not visible during the first examination, but were noted on October 10. The pathologist rendered an opinion to the effect that the bruises resulted from pressure being applied to the neck just before death. He also stated that it was highly unlikely that the bruises on the neck areas could have been caused by pressure having been applied to the throat by the investigating officers in an attempt to detect a pulse beat. A small amount of alcohol [.03 percent] was found in the blood.

The defendant gave the following testimony in his own behalf: On October 7 he worked from 8 a.m. to 4:30 p.m.; on the way home he stopped

at a cocktail lounge for three hours; he drank five highballs; around 8 p.m. he purchased two 6-packs of beer and went home; during the course of the evening, he and his wife drank the beer; he attempted to telephone his parents in Florida and, when he was unsuccessful in reaching them, he phoned relatives in Cleveland; he and his wife argued for several hours about the cost of the long-distance calls; while he had struck her on prior occasions, he did not strike her that evening; she went to bed around midnight; he stayed up to finish the beer; he fell asleep watching television; he awoke about 3:30 a.m., turned the TV off, secured the house, and proceeded to the master bedroom; when he entered the bedroom, the lights were off; he sat on the edge of the bed, undressed and hung his clothes in the closet; he noticed that his wife was not in bed; he turned on the light and saw her in a prone condition on the floor on the opposite side of the bed; she was lying face down with her head toward the bed; he turned her over, attempting to revive her with a damp wash cloth and by slapping her cheeks; he picked her up, placed her on the bed, and covered her; he realized she was dead because her face was cold and her fingernails were blue; he tried to find a pulse in the wrist and neck, but there was no sign of life; he believed that he then went into shock; he visited Jimmy's room to make sure the boy was covered; he sat for several hours in the living room; he probably wrote the note to his children around 6 a.m.; he called a friend, his son, and also attempted to call his parents and an aunt in Cleveland; he did not call an ambulance because he realized that his wife was dead; he did not call the police because he felt he had done something wrong and expected to be punished; he thought he had killed his wife; he thought so ". . . probably because of our past arguments"; when he put her on the bed, the right side of her face was swollen and he thought, ". . . I might possibly have done something to her"; however, he did not kill her; when his son arrived, he told him about the note but could not bring himself to tell the son that she was dead; the word "homicide" meant "death" to him; there was no particular reason for using that word at the police station.

About 10 a.m. on October 8 defendant was given a blood alcohol test. The reading was zero (0.00).

The issues on appeal may be defined as follows: (1) Whether the personal note that defendant left for his children was the product of an illegal search; (2) whether the evidence is sufficient to sustain the second degree murder conviction; and (3) whether it was incumbent on the trial court to give nonstatutory voluntary manslaughter instructions defining the defense of diminished mental capacity due to intoxication.[1]

Initially, it should be noted that no objection was raised in the trial forum

---

[1]This court requested that the parties consider and brief the third issue.

on constitutional or other grounds as to the admission of the note in evidence. ■ In the absence of special circumstances, questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial. (*People* v. *De Santiago,* 71 Cal.2d 18, 22-23 [76 Cal.Rptr. 809, 453 P.2d 353].) ■ Assuming that the question were properly before us, there is no merit to defendant's argument. The defendant himself reported a "homicide" at his own residence, and informed the officer that no one else was there. Consequently, the officers visited the home at the express or implied request of the owner. Upon entering,[2] the officers met the defendant's son, who voluntarily produced the note. Therefore, the note was not a product of an illegal search.

Defendant also contends that the evidence is insufficient to support the conviction because of the prosecution's failure to prove that a murder was committed or that he did it. ■ The corpus delicti of murder consists of the death of the alleged victim and a criminal agency as the cause of that death. (*People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1].) There is no dispute that the victim died. The issue is whether a criminal agency was responsible.

■ To establish criminal agency, the prosecution must prove with reasonable probability that the criminal act of another was the cause of death. (*People* v. *Ives,* 17 Cal.2d 459, 464 [110 P.2d 408].) Criminal agency may be established by circumstantial evidence and inferences reasonably drawn therefrom. (*People* v. *Corrales,* 34 Cal.2d 426, 429 [210 P.2d 843]; *People* v. *Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12]; *People* v. *Bolinski,* 260 Cal.App.2d 705, 714 [67 Cal.Rptr. 347].)

Defendant contends that the neck bruises could have resulted when either he or the officers endeavored to find a pulse or that the victim, as a result of excessive drinking, lost consciousness and fell with her nose and mouth pressed to the floor. ■ However, a plausible noncriminal explanation of the event does not compel a finding of lack of criminal agency. (*People* v. *Jacobson,* 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555].) Furthermore, the autopsy surgeon testified that the defense theory that the marks resulted from the finger pressure applied by the defendant and the officers in an attempt to discover a pulse beat was "highly unlikely."

Additionally, the defendant's own testimony contributes to the finding of a criminal agency. ■ A defendant who testifies is just as competent to establish the corpus delicti as any other witness. (*People* v. *Ditson,* 57 Cal.2d 415, 445-446 [20 Cal.Rptr. 165, 369 P.2d 714].) ■ The

---

[2]The record does not indicate the method by which the officers gained entry.

actions of the defendant can be part of the quantum of evidence establishing criminal agency. (*People* v. *Ogg,* 159 Cal.App.2d 38, 48 [323 P.2d 117].) While the defendant made several phone calls following his wife's death, he failed to inform friends or relatives of her demise, failed to get medical assistance, failed to notify the police immediately following discovery of the body. When he went to the police station, he reported a "homicide" rather than a death.

His further assertion that even though the corpus delicti was established there was insufficient proof indicating that he was the person who killed his wife is likewise unconvincing. ▮ There were three persons in the house at the time the victim met her death: the defendant, the victim, and their invalid son. There were no signs of forcible entry. Since death could not have been self-inflicted and the son had a congenital brain defect which prevented him from walking, it is reasonable to infer the defendant was the one person who had the opportunity to commit the crime. There was a history of marital discord. ▮ Prior abuse and beatings may indicate a pattern of conduct tending to identify the defendant as the perpetrator. (See *People* v. *Hiser,* 267 Cal.App.2d 47, 63 [72 Cal.Rptr. 906].) ▮ Defendant's actions following her death are also indicative of guilt. The note he left the children similarly portrays a consciousness of guilt. The manner in which he presented himself at the police station justified the inference of guilt. The foregoing evidence is sufficient to warrant the finding drawn by the jury. (See *People* v. *Saterfield,* 65 Cal.2d 752, 759 [56 Cal.Rptr. 338, 423 P.2d 266].)

The final question is whether the trial court erred in failing to render nonstatutory voluntary manslaughter instructions on its own motion. While the trial court properly instructed the jury on the elements of first and second degree murder (Pen. Code, §§ 187, 189), defined voluntary manslaughter in statutory terms (Pen. Code, § 192, subd. 1; CALJIC 115, 308, 308-A, 311, 311-C), and defined involuntary manslaughter (CALJIC 308-B 309 (rev.)), the court did *not* instruct on "nonstatutory voluntary manslaughter."[3]

There are two types of voluntary manslaughter: statutory and nonstatutory. (*People* v. *Castillo,* 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449].) ▮ Voluntary manslaughter is the intentional killing of a human being without malice; statutory voluntary manslaughter is an intentional killing in which malice is lacking because the killing occurred under circumstances or sufficient provocation such as to rouse the reason-

---

[3]The concept of "nonstatutory voluntary manslaughter" was developed to give effect to the statutory definition by recognizing the later development of the doctrine of diminished capacity which may render a person incapable of harboring malice. (*People* v. *Mosher,* 1 Cal.3d 379, 385 [82 Cal.Rptr. 379, 461 P.2d 659].)

able man to a fit of passion or sudden quarrel. (Pen. Code, § 192, subd. 1.) ▮ Nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked; it differs from murder in that the element of malice is rebutted by showing that defendant's mental capacity has been reduced by mental illness, mental defect, or intoxication. (*People* v. *Graham,* 71 Cal.2d 303, 315 [78 Cal. Rptr. 217, 455 P.2d 153].)

▮ The test for the giving of diminished capacity instructions on the court's motion is whether there is substantial evidence sufficient to inform the court that defendant is relying on intoxication as a defense. (*People* v. *St. Martin,* 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]; see *People* v. *Henderson,* 60 Cal.2d 482, 491 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Castillo, supra,* 70 Cal.2d 264, 270.)

Where the question is one of substantial evidence, each case must necessarily be resolved on the basis of its own facts and circumstances. ▮ The mere fact that the defendant may have been drinking prior to the commission of a crime is not enough to require instructions on intoxication (*People* v. *Miller,* 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297]), or instructions on the doctrine of diminished capacity due to intoxication. (*People* v. *Gonzales,* 4 Cal.App.3d 593, 608 [84 Cal.Rptr. 863].) There must also be evidence that the drinking had a substantial effect on him or that he was so intoxicated that he did not or could not harbor malice. (*People* v. *Bandhauer,* 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900].)

Several recent cases have considered the question of whether sufficient evidence was presented to establish that the accused had consumed an amount of alcohol sufficient to affect his mental faculties to the extent necessary to alert the trial court that defendant was relying on the defense of diminished mental capacity. Where the only evidence bearing on intoxication was defendant's testimony that he "had been drinking," but eyewitness accounts reflected that he acted completely sober, the evidence of intoxication was deemed so "minimal" as not to require instructions on diminished capacity due to intoxication. (*People* v. *Spencer,* 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134].) Where the defense theory was alibi, not diminished capacity, and defendant testified he had several beers the evening of the crime, the evidence of intoxication was characterized as "fragmentary," so as to obviate the necessity of giving diminished capacity instructions on intoxication. (*People* v. *Fain,* 70 Cal.2d 588, 596 [75 Cal. Rptr. 633, 451 P.2d 65].) When the victim of the crime testified the defendant had seven drinks in seven hours and weaved while driving, the

evidence of intoxication was regarded as being "sketchy" and "speculative"; therefore, it was not incumbent upon the court to give the diminished capacity instructions *sua sponte.* (*People* v. *Crawford,* 259 Cal.App.2d 874, 878 [66 Cal.Rptr. 527].)

In the case under review, defendant's testimony was that he had five highballs before coming home and that he and his wife then jointly consumed two packs of beer. Corroborating the defendant's self-serving declarations were the empty beer cans found at the scene and the son's testimony that the defendant was drinking a beer at the time he arrived at the family residence in response to his father's summons. However, there is no evidence that the drinking had any appreciable effect on the defendant. He testified that the drinks he consumed had not affected him and that he knew what he was doing the entire evening until the time he found the body, when things became a bit "hazy." Nevertheless, he was also able to recall with remarkable clarity most of the events following the discovery, including the phone calls to relatives and his movements in connection with checking on his invalid son's welfare. Nor did the son testify that his father appeared to be intoxicated. Completely refuting any suggestion that the defendant was intoxicated at the time of the commission of the offense is the result of a blood alcohol test administered the defendant a few hours after the victim's death with its reading of zero (0.00).

Finally, another significant consideration militates against a finding of error in the trial court's failure to instruct on the doctrine of diminished capacity based upon intoxication. The defense was *not* intoxication. Simply stated, the defense took the position that no crime had been committed in that no criminal agency was involved in the wife's death. The thrust of the defense was that death resulted from accidental means: a fall resulting from the victim's overconsumption of alcohol, from slipping on the bedroom floor, or some inexplicable reason. In the event the court had instructed on diminished capacity due to intoxication, such instructions would have conflicted with the defendant's theory of accidental death. The trial court acted with propriety in not rendering diminished capacity instructions.

The judgment of conviction is affirmed.

Tamura, J., and Gardner, J., concurred.