[Crim. No. 16036. In Bank. Jan. 17, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL DWANE CANTRELL, Defendant and Appellant.

674

**COUNSEL**

Ronald A. Mayo, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Alexander B. McDonald, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**McCOMB, J.**—In this case, where a judgment imposing sentence of life imprisonment followed jury trials on guilt, sanity and penalty of defendant who was charged with murder in the first degree and was prosecuted on two theories, felony murder and premeditated murder, a hearing was granted by this court, after decision by the Court of Appeal, Fourth District, Division One, for the purpose of giving further study to the problem whether it was prejudicial error to give CALJIC Instruction No. 806 concerning "irresistible impulse" during the guilt phase of the trial where diminished capacity was an issue.

After such study, we have concluded that the opinion of the Court of Appeal, prepared by Mr. Justice Ault, in all other respects correctly treats and disposes of the issues involved; that the giving of the instruction was error but was not prejudicial under article VI, section 13, of the California Constitution; that the judgment of the trial court should be affirmed; and that with certain changes, the opinion of the Court of Appeal is adopted as and for the opinion of this court. Such opinion (with appropriate deletions and additions as indicated)* is as follows:

Samuel Dwane Cantrell was indicted for the murder of Danny [ ] [W.]. He entered pleas of not guilty and not guilty by reason of insanity. A jury, by separate verdicts, found him guilty of first degree murder, sane at the time he committed the offense, and fixed his punishment at confinement in the state prison for life. His motion for new trial was denied, and the trial court sentenced him to life imprisonment. He appeals from the judgment of conviction.

On appeal, Cantrell raises the following contentions:

1. His extrajudicial statements and confessions should have been excluded because the prosecution failed to prove the corpus delicti for the crime of murder.

2. His extrajudicial statements concerning his acts of sexual misconduct with the 12-year-old victim should have been excluded because the prosecution failed to establish the corpus delicti for the underlying felony (child molesting, Pen. Code, § 288), thereby precluding it from proceeding under the felony-murder doctrine.

---

*Brackets together, in this manner [ ], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Argonaut Ins. Co.* v. *Transport Indem. Co.,* 6 Cal.3d 496, 500 [99 Cal.Rptr. 617, 492 P.2d 673].)

3. Even if his extrajudicial statements concerning his sexual misconduct with the victim were admissible, the evidence failed to establish a violation of Penal Code section 288 as a matter of law.

4. The jury was not properly instructed on the intent necessary to establish the crime of child molesting.

5. The trial court erred in not giving a *sua sponte* instruction limiting the effect of the incriminating statements he made to examining psychiatrists.

6. The trial court gave erroneous and improper instructions on voluntary and involuntary manslaughter.

7. The trial court prejudicially limited the examination of the psychiatric experts regarding his diminished mental capacity.

8. It was prejudicial error to give CALJIC Instruction No. 806 concerning "irresistible impulse" during the guilt phase of the trial where diminished capacity was an issue.

## FACTS

Danny [ ] [W.], age 12, lived in Oceanside with his parents, three brothers and a sister. On Friday, August 15, 1969, he left his home at 6:55 p.m., saying he intended to see a friend at the beach. When he left he was wearing a jacket and a silver-colored chain bracelet. Insofar as is known, he was never seen alive again by anyone except the defendant Cantrell.

Cantrell spent the evening of Saturday, October 18, and the early morning hours of Sunday, October 19, with his close friend Edward Stringer, first driving to San Diego and then visiting some girls in Oceanside and having a few drinks. On the way home, Cantrell became very quiet and put his head down. When Stringer asked what was the matter, Cantrell said, "I think I have killed a kid." Stringer didn't believe him. Cantrell then related he had picked up a boy named Danny [ ] [W.] in Oceanside, had taken him for a ride in the Camp Pendleton area, had played with him and had strangled him. Stringer testified: ". . . he told me that he was queering with the kid." ". . . the kid got disturbed and shook up and started struggling, screaming, and he strangled him." Cantrell then took Stringer to a spot in the Del Dios area where he said he had thrown the body. They could see nothing from the road and they did not go down the incline. Stringer told Cantrell he was going to call the police and suggested Cantrell talk to Stringer's friend in the sheriff's office to see if what he said was true. Cantrell agreed.

Stringer reported the matter to the sheriff's office shortly after Sunday

midnight. Early Monday morning, October 20, 1969, Deputy Sheriff Ring and Sergeant Norton, homicide detectives in the sheriff's department, went to Cantrell's residence to investigate. As soon as Ring said he had talked with Stringer, Cantrell stated he thought he may have killed a boy. Ring immediately advised him of his constitutional rights. Cantrell said he understood about his rights, having been a military policeman, and that he was willing to talk. He repeated the same story to Ring, but with more details. He told of going for a ride with Danny, who he thought was 13 or 14 years old. He said they parked, got out of the car and somehow, he couldn't recall how, Danny had his clothes off. He said he fondled the boy's penis with his hands and that the boy began to scream. He said, "This must have triggered me because I took my hands and choked him. I then took a rag or a T-shirt and tied it around his neck." He said he put the nude body in his car and drove around Del Dios area, where he finally threw the body down a bank. He stated he had thought it was all a nightmare when he awoke the next morning until he found some weeds in his car. He recalled he had returned to Del Dios area to look for the body, but found nothing.

Cantrell did not testify during any part of the trial. At the guilt phase, he presented several character witnesses and the testimony of three of the four psychiatrists who had examined him. All of the psychiatrists who testified agreed Cantrell was functioning under a diminished capacity at the time of the homicide. Basically, all agreed he did not have the mental capacity to deliberate or intend to take human life at the time he strangled Danny [ ] [W.]. [ ] [The] psychiatrists testified Cantrell's strangling of Danny was a compulsive reaction to the boy's yelling and struggling which, due to his mental condition, Cantrell had no power to control.

## CORPUS DELICTI

█ A prima facie showing of the corpus delicti of the crime charged must be made before a defendant's extrajudicial statements, admissions or confessions may be received in evidence (*People* v. *Cooper* [(1960)] 53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d 964]). █ To establish the corpus delicti in the instant case, it was only necessary for the People to show a reasonable probability the criminal act of another caused the death of Danny [ ] [W.]. (*People* v. *Ives* [(1941)] 17 Cal.2d 459, 464 [110 P.2d 408]; *People* v. *Small* [(1970)] 7 Cal.App.3d 347, 354 [86 Cal.Rptr. 478].) █ The corpus delicti may be established by circumstantial evidence, and by the reasonable inferences to be drawn from such evidence (*People* v. *Miller* [(1969)] 71 Cal.2d 459, 477 [78 Cal.Rptr. 449, 455 P.2d 377]). █ While slight evidence is sufficient to establish the corpus

delicti, it must be proved entirely independent of and without considering the defendant's extrajudicial statements (*People* v. *Mehaffey* [(1948)] 32 Cal.2d 535, 544-545 [197 P.2d 12]).

■ The evidence introduced at the trial before the defendant's extrajudicial statements were received was sufficient to make a prima facie showing Danny [ ] [W.] had met his death through a criminal agency. It showed: Danny, age 12, left his home in Oceanside to see a friend at the beach at 6:55 p.m. August 15, 1969, and was never seen alive again. He was wearing a jacket and was dressed for the weather. He was also wearing a silver-colored chain link bracelet without a metal plate on it. He was in good health and not given to fainting spells or stumbling of any kind. Officer Ring, on October 20, 1969, found the remains of a human being consisting of a skull, five or six of the twelve long bones from the victim's arms and legs, hair and some mummified skin, at the base of a culvert in a remote area of San Diego County, approximately 26 miles from Danny's home. None of the long bones found had any fractures or breaks. Ring had had occasion to examine the remains of approximately 30 persons who had been struck on the highway by automobiles. In such cases the long bones and other bones of the body were fractured severely. No clothing was found in the area where the remains were discovered; in Ring's experience it was unusual not to find clothing of a decedent who had died by accidental means. There were no skid marks on the road in the area where the remains were found nor any broken vehicle glass. A silver-colored chain link bracelet was found around the end of two long bones of the skeleton. Danny's father testified the bracelet was similar to the one Danny was wearing at the time he left home. The teeth found in the skull were unusual and appeared to Danny's father and to a dentist to be those of the boy.

Tested by the rules announced above, we believe the sufficiency of the proof of the corpus delicti is not open to serious dispute. The court properly permitted the introduction of defendant's extrajudicial statements.

### CORPUS DELICTI OF THE UNDERLYING FELONY

■ Contrary to Cantrell's contention, the People need not establish the corpus delicti of the underlying felony before introducing a defendant's extrajudicial statements. In *People* v. *Miller* [(1951)] 37 Cal.2d 801 [236 P.2d 137], the defendant contended it was incumbent upon the People to establish the corpus delicti of both the crime of murder and the underlying felony involved (attempted robbery) before his extrajudicial statements could be received in evidence. The court held the only prerequisite

to consideration of extrajudicial statements was proof of the corpus delicti of the crime of murder, stating at page 806: "The corpus delicti of the crime of murder having been established by independent evidence, both reason and authority indicate that the circumstances surrounding the commission of the crime can be shown by the extrajudicial statements of the accused, and that such evidence of the surrounding circumstances may be used to establish the degree of the crime committed." [ ] *People* v. *Cooper, supra,* 53 Cal.2d 755, at page 765, rejected the identical claim. [ ] ■ Thus Cantrell's extrajudicial statements were properly admitted to show he had been sexually molesting Danny immediately before he strangled him, so the prosecution could establish the degree of the crime by invoking felony-murder rules. (Pen. Code, § 189.)

### EVIDENCE OF INTENTION TO VIOLATE PENAL CODE SECTION 288

■ Assuming the admissibility of his extrajudicial statements, Cantrell nevertheless contends the evidence was insufficient to establish he violated Penal Code section 288, the underlying felony relied upon. The thrust of his argument is that there was no proof he acted with the specific intent required to violate the section. The contention is without merit. Under the cases cited in the preceding paragraph, Cantrell's extrajudicial statements were not only admissible to show he committed acts proscribed by Penal Code section 288, but also to prove he did so with the requisite specific intent. We know of no authority, and Cantrell has cited none, which holds the People must prove the underlying felony independent of and without reference to the defendant's extrajudicial statements. His admissions he was "queering with the kid," fondling the boy's penis with his hands, and that he strangled him when he started to yell, all indicate his sexual contact with Danny was neither innocent nor accidental. The reasonable inference to be drawn from the evidence is that Cantrell engaged in the acts with the intent of arousing, appealing to, or gratifying his own lust, passion or sexual desires. (Pen. Code, § 288.)

### INSTRUCTIONS ON SPECIFIC INTENT REQUIRED UNDER PENAL CODE SECTION 288

As Cantrell concedes, the trial court, in the course of its instructions, correctly informed the jury of the specific intent required to violate Penal Code section 288. ■ CALJIC Instructions Nos. 521, 523, 524 and 526 [now CALJIC Nos. 10.30-10.34] were given substantially verbatim.[1]

---

[1]These instructions were given three times. They were part of the original in-

Cantrell's quarrel with the instructions in this area is that other instructions involving felony murder and intent generally used the terminology "with the specific intent to commit a lewd and lascivious act on the body of a child." The court's instructions to the jury must be considered as a whole, and each instruction must be regarded in the light of the others (CALJIC No. 5—now CALJIC No. 1.01), and the jury in this case was so instructed. The instructions complained of concerning the specific intent to commit a lewd and lascivious act must be read in the light of the other instructions which defined a lewd and lascivious act and which included the requirement of the specific intent to arouse, appeal to, or gratify the lust, passions or sexual desires of the minor or the accused. Since these instructions correctly and adequately advised the jury of the specific intent required to violate Penal Code section 288, the court was not required to repeat the entire definition each time it referred to that specific intent. Taken as a whole, the instructions were not misleading or erroneous, and nothing before us indicates the jury was in fact misled (*People* v. *Kearney* [(1942)] 20 Cal.2d 435, 439 [126 P.2d 612]).

---

structions, and were repeated twice later as part of the instructions in answer to specific questions asked by the jury during the course of its deliberations. The actual instructions given on the subject read:

"Every person who wilfully and lewdly commits any lewd or lascivious acts upon or with the body, or any part or member thereof, of a child under the age of fourteen years of age, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or such child is guilty of a violation of Section 288 of the Penal Code.

"It is not necessary in perpetrating or attempting to perpetrate a lewd and lascivious act on the body of a child that the bare skin of the minor be touched. The touching, fondling, rubbing or feeling of the body, members or private parts of the minor under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lusts, passions and sexual desires of either the minor or the accused, constitutes the offense, even though such touching, fondling, rubbing or feeling was through the clothing of the minor.

"Although an essential element of perpetrating or attempting to perpetrate a lewd and lascivious act on the body of a child is an intent to arouse, appeal to, or gratify the lusts, passions or sexual desires of either the person committing the acts or the child, the law does not require as an essential of the crime that the lusts, passions, or sexual desires of either of such persons be actually aroused, appealed to, or gratified.

"Want of consent on the part of the child is not an element of perpetrating or attempting to perpetrate a lewd and lascivious act on the body of a child. Whether or not the child consented to the conduct, if it occurred, is immaterial, except only that evidence of consent or lack of it tends to show a circumstance in the whole set of circumstances to be considered by you in determining whether or not such act was committed by the defendant.

"A good faith belief on the part of a person alleged to have committed a violation of Section 288 of the Penal Code that the victim of the offense was over the age of fourteen years does not constitute a defense of the crime."

### Failure to Give Instructions Limiting the Effect of Incriminating Statements Made to the Examining Psychiatrists

 Relying on *In re Spencer* [(1965)] 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], Cantrell contends the trial court committed prejudicial error in failing, *sua sponte,* to instruct the jury [that] the psychiatrists' testimony, relating the incriminating statements he made to them, should not be regarded as proof of the facts disclosed by the statements. At page 412 the court in *Spencer* stated: "If defendant does specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should be permitted to testify at the guilt trial, but the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion."

*Spencer* does not hold the court must give the limiting instruction concerning psychiatric testimony, *sua sponte.* Here it was Cantrell, not the People, who offered the psychiatric testimony, and it was his attorney who elicited the incriminating statements from the medical experts. He made no request to limit the testimony at the time it was offered and made no tender of the instruction he now claims should have been given. "Although in criminal cases the court must instruct the jury on its own motion as to applicable general legal principles, even though the parties fail to propose such instructions, the court need not render particular instructions as to specific points unless the parties request them or they are essential to a fair trial." (*People* v. *Morse* [(1964)] 60 Cal.2d 631, 656 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; see also *People* v. *Hood* [(1969)] 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].)

 The incriminating statements Cantrell made in the course of the psychiatric examinations, related by the psychiatrists in their testimony at the trial, were basically the same incriminating statements he had made to Stringer and Officer Ring. They were already properly before the jury, and a limiting instruction would have had little or no effect. Under these circumstances, the failure to give the instruction did not deprive Cantrell of a fair trial. In the absence of a request, the court was under no duty to instruct the jury concerning the limited effect of the incriminating statements disclosed by the psychiatrists' testimony.[2] (See *People* v. *White* [(1958)] 50 Cal.2d 428, 430 [325 P.2d 985].)

---

[2] Only two of the three psychiatrists who testified at the guilt phase of the trial were appointed pursuant to Penal Code section 1027. The third psychiatrist was

## THE MANSLAUGHTER INSTRUCTIONS

The trial court gave the following manslaughter instructions:

["If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder.]

"Manslaughter is the unlawful killing of a human being, without malice aforethought. It is not divided into degrees but is of two kinds, namely, voluntary manslaughter and involuntary manslaughter.

"As applied to this case, voluntary manslaughter is the intentional and unlawful killing of a human being by another where the mental capacity of the defendant was so affected by mental disease or from some other cause as he was not able to harbor malice as has been heretofore defined for you in these instructions.

"As applied to this case, involuntary manslaughter is the unlawful killing of one human being by another due to diminished capacity, the defendant —by another if, due to diminished capacity, the defendant had neither malice as heretofore defined for you nor an intent to kill."

 Cantrell contends the instructions erroneously limited the basis for a manslaughter verdict to a consideration of diminished capacity. The instructions were proper. Under the evidence the only possible basis upon which the jury could have found Cantrell guilty of manslaughter was under the theory of a diminished capacity.

Defense evidence presented at the guilt phase of the trial consisted entirely of the testimony of character witnesses and psychiatrists. No evidence was presented at the guilt phase, by either the People or the defense, from which it could have been inferred that Danny [ ] [W.] provoked the attack which caused his death or that Cantrell acted "upon a sudden quarrel or in the heat of passion." (Voluntary manslaughter, Pen. Code, § 192.) Likewise, no evidence was presented from which it could be inferred the death came about in any manner described in the statutory definition of involuntary manslaughter (Pen. Code, § 192).

The manslaughter instructions were not required in this case because the evidence was [not] susceptible of an interpretation that the homicide came within the statutory definition of manslaughter contained in Penal Code section 192. If the homicide was manslaughter, and not murder, it

selected by Cantrell's attorney to advise the defense. The incriminating statements were made to all three of the psychiatrists.

was [ ] manslaughter [ ] solely because of the existence of a diminished capacity (see *People* v. *Castillo* [(1969)] 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449]). ▮ The rule requiring the court to instruct the jury upon every material question upon which there is any evidence whatsoever deserving of consideration (*People* v. *Modesto* [(1963)] 59 Cal.2d 722, 727 [31 Cal.Rptr. 225, 382 P.2d 33]), does not imply instructions should be given on issues and questions not raised by the evidence. ▮ Here, the court's instructions properly limited the jury's consideration of manslaughter to a consideration of diminished capacity.

### RULING AND INSTRUCTIONS RE IRRESISTIBLE IMPULSE

[Defendant contends that it was prejudicial error for the court to give CALJIC Instruction No. 806 on "Irresistible Impulse." This reads: "The law does not recognize the plea of irresistible impulse as a defense to crime. If a person is conscious of, knows and appreciates the nature and wrongfulness of his act, then he does the act at his peril, and the plea of irresistible impulse will not avail him." The counterpart of the instruction given, with no change in meaning, is now found in CALJIC (3d ed.) No. 4.05, and contains the caveat: "This instruction is designed for use only in connection with the plea of 'not guilty by reason of insanity.' It must not be used where there is a claim of diminished capacity."

[The giving of this instruction at the guilt phase, while error, cannot be held prejudicial when considered under the compulsion of article VI, section 13, of the state Constitution which provides: "No judgment shall be set aside . . . in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]

The courts of this state have long refused to equate irresistible impulse with legal insanity or to accept it as a complete defense to a crime. (*People* v. *Hoin* [(1882)] 62 Cal. 120, 122-123; *People* v. *Hubert* [(1897)] 119 Cal. 216, 223 [51 P. 329]; *People* v. *Nash* [(1959)] 52 Cal.2d 36, 45 [338 P.2d 416].) ▮ Precisely for this reason, a defendant who raises the defense of diminished capacity at the guilt phase of the trial must be permitted to show by competent evidence his act was the [ ] [product] of an irresistible impulse and that the irresistible impulse was due to mental disease. ▮ Under the *Wells-Gorshen* rule of diminished capacity, as amplified and clarified in the more recent cases of *People* v. *Conley* [(1966)] 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Castillo, supra,*

70 Cal.2d 264; and *People* v. *Mosher* [(1969)] 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], relevant evidence of an accused's diminished mental condition affecting intent, where intent is an element of the crime charged, is admissible at the trial of the guilt issue. As stated in *People* v. *Wells* [(1949)] 33 Cal.2d 330, 351 [202 P.2d 53], and repeated in *People* v. *Nicolaus* [(1967)] 65 Cal.2d 866, 881 [56 Cal.Rptr. 635, 423 P.2d 787]: " 'Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible.' " [ ] ▆▆ Competent testimony to the effect the act of killing resulted from an irresistible impulse due to mental disease is relevant evidence bearing on the issues of intent to kill and malice aforethought. Since such testimony bore directly upon the accused's mental condition affecting intent and did not amount to proof of insanity, it follows it was admissible at the guilt phase of the trial.

[For this reason also, the jury should have been instructed on the relevance of the irresistible impulse evidence to the defense of diminished capacity. The failure to do so, exacerbated by the error in giving former CALJIC Instruction No. 806, vitiated the jury's consideration of the prosecution's theory that the homicide was first degree murder because it was deliberate and premeditated. It is true the jury was correctly instructed on the prosecution's alternate theory, to wit, felony murder occurring in the perpetration of a violation of Penal Code section 288. ▆▆ But "In civil appeals it has been the invariable rule that reversal is required when it is impossible to determine whether the verdict was based on admissible evidence submitted under correct instructions, or on erroneous determination of questions improperly submitted to the jury. [Citations.] It is equally (if not more) important to grant the same benefit of the doubt to a defendant on trial for his life." (*People* v. *Robinson* (1964) 61 Cal.2d 373, 406 [38 Cal.Rptr. 890, 392 P.2d 970].)

[On the other hand, if there is no such doubt—i.e., if on the record it appears beyond a reasonable doubt that the jury based its verdict on the theory supported by "admissible evidence submitted under correct instructions"—there is no miscarriage of justice and the judgment must be affirmed pursuant to article VI, section 13, of the Constitution. Such is the case before us. ▆▆ Essentially the sole evidence of diminished capacity was the testimony of the three psychiatric witnesses. If the jury did not believe that testimony, of course, the error was immaterial. If the jury did believe that testimony, the record, as we shall explain, compels affirmance of the judgment on the felony-murder theory.

[Defendant emphasizes that the psychiatric witnesses were unanimous in concluding he was acting impulsively and without premeditation, deliberation, malice or intent to kill when he choked his victim to death. But the same witnesses were also unanimous in explaining this opinion on the ground that the choking was a panic reaction triggered by the boy's screams while defendant was performing a lewd sexual act on him.[3] And they were no less unanimous in concluding that at the time he engaged in that sexual act, defendant was not suffering from any diminished capacity whatever.[4]

---

[3]Dr. Alfred L. Larson testified that in his opinion defendant was not a "sexual psychopath"; that he did not act with premeditation or with malice at the time of the killing; that he did not lack capacity to control "all of his impulses" at that time and that "in the killing of the boy, I have a feeling that he—his malice wasn't towards the victim, but what had happened in the car, the homosexual act, with a veritable child, a member of his own sex, recalled to him the unpleasantness of the past, the problems he was having with women, the problems he was having with his temptations with men, and all cumulated in an extremely hostile thought or malice towards the symbol of what had happened, not the victim"; that defendant did something (fondling the boy's penis) which was very "foreign and alien to his basic personality. But the compulsion, the situation, something in the conglomeration of factors caused it to occur and he was very much panicked, frightened and with relatively little control at the time" that he was choking the boy.

Dr. Donald F. Duff testified that in his opinion defendant had a schizoid personality; when asked whether defendant had sufficient mental capacity at the time of the choking to exercise a clear, deliberate attempt to take a life he answered, "No, I wouldn't think so. I think he was so panicked that you know, he wanted the noise to stop. It was almost like there was a divorcing of what the act is, or taking someone's life, as opposed to the noise stopping. I think he was so panicked, he was not able to take the time to—had the ability, but the panic interfered." In his opinion at the time of the choking defendant "was trying to turn off some noise, not trying to take a human life"; that he did not have sufficient mental capacity to reflect on the gravity of the contemplated act at that moment and that his design and purpose was not specifically to take a life. When the boy started to scream defendant knew that he raised his hands and put them on the boy's throat but he was so panicked by the noise he didn't know he was squeezing.

Dr. Phillip Kavanaugh also diagnosed defendant as having a schizoid personality; that he was only a "situational homosexual"; that at the time of choking he did not have a sufficient mental capacity to exercise a clear deliberate intent to take a life, to maturely and meaningfully reflect on the gravity of the contemplated act, or to harbor either express or implied malice aforethought. His explanation of defendant's violent behavior was that "there was a point at which something that happened, namely, the screaming of the boy, set off something inside of Sam Cantrell, chain reaction. And he stopped responding to the boy and his outward surroundings or the outer world, and he began responding to his inner world . . . . He was responding to something inside of him, and his violence, in my opinion was a result of the reaction to his own fear of going crazy."

[4]Thus Dr. Larson testified that in his opinion defendant intended to perform the sexual act on Danny and had the capacity to form that intent; Dr. Duff stated that defendant knew he was manipulating the boy's genitals and intended to do so; and Dr. Kavanaugh was of the view that defendant had sufficient mental capacity to reflect on the possible consequences of this sexual act. There was, we add, no contradictory evidence.

■ [The value of an expert's opinion is dependent on the truth of the facts he assumes as the basis of that opinion. (Evid. Code, § 801; *Owings* v. *Industrial Acc. Com.* (1948) 31 Cal.2d 689, 692 [192 P.2d 1], and cases cited.) Here the assumed fact—that defendant was performing a lewd sexual act on his victim when the killing took place—is consistent with the only other evidence of the circumstances of the crime, i.e., defendant's uncontradicted and voluntary statements to his friend Stringer and to the police. Accordingly, we cannot believe the jury would have accepted the opinion of the psychiatrists that defendant suffered from diminished capacity at the time of the homicide without also accepting the truth of the assumed fact supporting that opinion.[5]

[It follows that if the jury believed the psychiatrists' testimony on diminished capacity, defendant must nevertheless have been found guilty on the felony-murder theory. The evidence of diminished capacity related only to defendant's ability to premeditate and to harbor malice. These elements are eliminated by the felony-murder doctrine, and the only criminal intent required is the specific intent to commit the particular felony. ■ As we have seen, the evidence was undisputed that defendant had the mental capacity to intend to commit the felony denounced by section 288. "[S]uch a killing is murder of the first degree by force of section 189 of the Penal Code, regardless of whether it was intentional or accidental." (*People* v. *Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570].) ■ The error on the subject of diminished capacity thus could not possibly have affected the jury's verdict, and no miscarriage of justice resulted.]

The judgment is affirmed.

Wright, C. J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I concur in the judgment.

---

[5]In confirmation of this analysis, we note that the jury interrupted its deliberations to ask the court the following question: "Your honor, if the defendant had the intent to commit a lewd and lascivious act upon the body of a child and did so, and at the time he performed this act he had full capacity of himself and consequently a death occurred following that act, does this constitute first degree murder, regardless of any diminished capacity after the lewd act and during the strangulation?"