[No. C003588. Third Dist. Jan. 30, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES FRANCIS RIEDERER, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, IV, and V of the discussion.

**COUNSEL**

William J. Owen and Albert W. Brodie for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, W. Scott Thorpe and Clayton S. Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

DAVIS, J.—A jury convicted defendant, James Francis Riederer, of first degree burglary, attempted murder, assault with a firearm (two counts), and disobeying a domestic relations court order, and found he used a firearm in the commission of the burglary and attempted murder. (Pen. Code, §§ 459, 460, subd. 1, 664/187, 245, subd. (a)(2), 273.6, 12022.5.) The court sentenced him to a total of 10 years in state prison. On appeal he contends the court should have granted his motion for a new trial on the ground of juror misconduct, should have instructed the jury on the crime of attempted voluntary manslaughter, improperly instructed on assault with a firearm, and erroneously sentenced him to a three-year term in state prison for a crime of which he was not convicted. We hold the trial court erred in failing, sua sponte, to instruct the jury on the crime of attempted voluntary manslaughter and will conditionally reverse. In rejecting defendant's contention that the court's erroneous instruction on assault with a deadly weapon was reversible per se, we choose not to follow the holding in *People v. Burres* (1980) 101 Cal.App.3d 341 [161 Cal.Rptr. 593]. For that reason we will publish portions of the opinion that address that holding.

FACTS

In late 1986, defendant and his wife Magdelena Riederer were experiencing marital problems resulting in the couple's separation and the beginning

of dissolution proceedings. They had been married for 12 years. On both November 19 and 20, 1986, Amador County sheriff's officers were dispatched to defendant's residence in response to his telephone call. On each occasion, upon the officers' arrival, defendant informed the officers of his marital problems. "He also expressed that he had thoughts about going to the residence where his wife was staying with a gun and taking her life."

In February of 1987, Magdelena and her three children moved to the residence of her mother, Margareta Ruis, and her stepfather, Tony Ruis, located on Butte Mountain Road in Jackson. This followed a "hot" argument about money, defendant's drinking and his lack of employment. When defendant went for a gun his son Stephan (age 10) yelled, " 'No, Dad, don't shoot her. Don't,' " and he told his son he had not meant to shoot her. At various times he threatened to kill her on the phone and in person. On April 16, 1987, Magdelena obtained a restraining order ordering defendant to remain at least 100 yards away.

On May 10, 1987, Magdelena met defendant at his parents' house. He wanted her to sign a power of attorney so he could arrange a loan. Defendant advised her not to take any furniture or things from the house, and told her he was going out of town. She knew he would be upset if she took anything from the house while he was gone. On May 16, 1987, she went to the house. She took clothing for the children, a hall tree, vanity table and chair, grandfather clock, video cassette recorder, and kitchenware. She went because she knew he was out of town and that he became hostile whenever she brought the subject up.

At approximately 3 a.m. on May 17, 1987, Margareta Ruis was awakened by the sound of defendant arriving at the residence. Margareta observed him approach the residence with a rifle (subsequently determined to be a loaded .30-30 caliber).

Defendant shattered the glass insert in the front door and hit the door frame with the butt of the rifle. He forced his way though the door and ". . . just ran in the house like a madman."[1] When Margareta Ruis encountered him he said, "Get out of my way. I'm going to kill Magdelena." When Margareta began to struggle with him he pushed her to one side with the rifle. When Tony Ruis encountered defendant he said, "I don't want to hurt you, Tony. Get out of my way. I'm going to kill Magdelena." As Tony attempted to disarm him he repeated, "I'm going to kill Magdelena. Let go of the rifle, Tony." That is all he was saying: "He was obsessed." During the

---

[1] At one point Magdelena hid in a closet and later she fled the house. Defendant never saw her that night.

struggle for the weapon, it broke into two pieces. Defendant discarded the weapon and ran to the rear bedroom where he seized his young daughter, Elena, apparently thinking his wife was in her bed. He declared, " 'This is the woman I want to kill.' " He dragged the screaming child by the hand into the kitchen area.

Meanwhile, Margareta telephoned the police.[2] Defendant answered when the police called back. He said, " 'My wife came to rob me and I'm mad.' " Tony obtained a kitchen knife and ordered defendant to leave the residence. When defendant attempted to grab for the knife, he was cut on the hand. He then fled from the scene, but was arrested nearby.

The only evidence presented by the defense was defendant's testimony which we recount at length in order to consider his challenges to the instructions given.

Defendant had been a factory representative making $60,000 per year. He was also able to pay his wife $1,000 per month as his secretary-treasurer. In April 1986, he lost his business when the factory he had been representing since 1970[3] dropped his organization. He went into partnership with another man and sold patio heaters. His wife began to work in September 1986. In October defendant lost his new business because the factory changed distributors. The family suffered a significant loss of income, and his wife had been complaining since summer. Shortly before Thanksgiving the couple separated. In early December his wife had him arrested for carrying loaded guns in the trunk of his car.

Defendant drank half a fifth of Scotch every night and sometimes beer in the morning. When he called the sheriff's office on November 19, he needed someone to talk to because he was depressed. His wife thought his drinking was preventing him from finding work and his own parents were siding with her. The officers suggested he seek alcohol counseling. Although he talked about killing his wife he knew he could not do that because it would end up hurting his children. The following night they came to check on him, and he eventually sought counseling and began going to Alcoholics Anonymous meetings.

The couple briefly reconciled in December but his wife began making preparations to leave soon after Christmas. "She became extremely violent and yelling and screaming all the time. Making all kinds of accusations; making preparations to leave a second time." She obtained a job which provided medical benefits and refused to list him as a spouse although he

---

[2] Officer Knobelauch testified he received a call from his dispatcher at 2:58 a.m.

[3] Defendant was an Army Ranger between 1967 and 1969.

needed insurance to see a doctor about his foot problems. There were continuous arguments about his drinking, and she was drinking as well. The couple was being pressed by creditors: ". . . [W]e were both under a lot of pressure. Continuously the phone was ringing for bill collectors. The Internal Revenue Service kept harassing us about the taxes. State Franchise [Tax] Board had gone and confiscated all the children's savings accounts. There was a lot of pressure, and she was drinking a lot heavier—more heavier than she had ever normally drank."

On February 21, 1987, they got into a big fight in the morning after Magdelena began yelling and screaming at defendant because he did not have a job. She stated flatly she was getting a divorce. The argument picked up that evening when his wife demanded he move his guns into storage. After the first separation she went around telling people she was afraid of guns and was afraid he would shoot her. Stephan tried to explain to his mother that defendant did not intend to shoot her and she said, " 'you're all together. You're all against me,' and she went and ran into her own bedroom."

That evening they argued again. Defendant was planning to go to a trade show at Cal Expo to "pick up another line" (i.e., find another factory to represent). Magdelena wanted to go and also take the children to get new shoes. He objected because it would cost too much for the whole family to eat out and go to the show.

Magdelena prevailed and on Sunday they all went to Cal Expo. They had a pleasant day and did not argue. That evening she said she would divorce him. On Monday, without further discussion, she left him again. He discovered she was at his parents' house. Many times over the next two weeks he tried unsuccessfully to see his children and find out what was going on. They appeared in court in late March.

On May 10, he met her at his father's house to arrange a "bridge" loan to clear their bills until the house could be sold. "The first thing she did was start telling me the things she wanted out of the house." He told her the attorneys could handle that. He told her he would be out of town and obtained her promise not to go into the house while he was gone. She agreed. He then went to the Bay Area to conduct business.

He left the Bay Area around 5 or 5:30 p.m. on Saturday, May 16, 1987. He stopped for food in Clements and went to a bar to play pool. He had several drinks and stayed until "last call" around 1:45 a.m. on May 17. It takes about 45 minutes to reach his home in Jackson. When he arrived he became suspicious because the front door was locked. When he entered the

house he saw the grandfather clock and hall tree were missing and he got angry. To teach his wife a lesson he went to the gun case and grabbed a gun without thinking whether it was loaded. He wanted to scare her.

Defendant drove to his father's house to find Magdelena, and then went to her parents' house. This took about 15 minutes. He left his truck, returned to get the gun he had left inside the truck, then ran to the door and banged on it with his *shoulder*.[4] "I really wasn't thinking that clearly how I'd get in." He was screaming that he wanted to get his wife. He pushed Margareta aside and told her he would kill Magdelena if he had to. Tony grabbed the rifle. Defendant forced Tony gently to his knees. When the rifle broke he just walked away. "I still wanted her [Magdelena] to confess. I was looking—matter of fact, at one point I was in the bedroom with Elena and, of course, I thought it was Sean in there. But I grabbed Elena's ankle and she yelled at me and said, 'Daddy, that was my ankle.' I thought it was Magdelena. I wanted to drag her out of there, set her down in the living room and tell the truth." When he picked up the phone to talk to the police, "I wanted to let them know that I was going to stay there until he got there. I was hoping that with the police there I could get to the bottom of what I wanted to do." "I was hoping that they would make Magdelena sit down, calm the situation down. Obviously was quite upsetting. Make them—or have them calm the situation down; make her sit there and then talk about it."

When Tony drove him out of the house with the knife: "I went outside with the theory that maybe she had run outside; Magdelena had run outside." "I still wanted to talk to her; I still wanted her to admit what she'd been doing."

He testified he never intended to shoot his wife—only to frighten her. "I would never kill her. Hurt her, I don't know. If I'd seen her I might have hurt her a little bit. I might have punched her or pulled her hair, but I never would have killed her." "[A]t the time I didn't consider it irrational. I thought I was just tired of the whole situation. I wasn't thinking rationally. I certainly wasn't evaluating my actions." It had made him mad that Magdelena was telling people he wanted to kill her.

---

[4] In rebuttal a prosecution witness testified the door was hit with the butt of the .30-30.

DISCUSSION

I, II*

. . . . . . . . . . . . . . . . . . . . . . .

III

We granted defendant permission to file a supplemental brief raising a new issue and the People filed timely opposition thereto. ▮ Defendant contends the convictions on the two assault with a firearm counts must be reversed because the court improperly instructed the jury.

At the request of both defendant and the People the court gave the following instruction: "The requisite intent for the commission of an assault with a deadly weapon is the intent to commit a battery. Reckless conduct alone does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another. *However, when an act inherently dangerous to others is committed with a conscious disregard to human life and safety, the act transcends recklessness and the intent to commit a battery is presumed.*" (Italics added.) For the moment we will assume the instruction improperly deprives the jury of its duty to determine an element of the offense (intent to commit battery). (*People* v. *Burres, supra*, 101 Cal.App.3d 341 [giving this instruction is reversible per se error], relying on *Sandstrom* v. *Montana* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213].)

If counsel had a deliberate tactical purpose in requesting this instruction any error in giving it would be invited. (See *People* v. *Wickersham, supra* [(1982)], 32 Cal.3d [307], 332-335 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153].) The People assert a valid tactical purpose in this situation need not have been expressed as such but can be derived from the general tactics displayed by the defense and defense counsel's decision to request the instant instruction. The People note defense counsel forcefully argued to the jury defendant had no intent to commit a battery on Tony or Margareta as shown by his testimony about gently letting Tony to the ground as they struggled. This gave defense counsel the opportunity to argue defendant's act was not inherently dangerous to others. Here, we do not have to reach the issue of whether counsel's conduct at trial constituted an express tactical decision. (*Wickersham, supra*, 32 Cal.3d at pp. 333-334 [holding that absent an express statement that counsel is not opposed to necessarily included offense

---

*See footnote, *ante,* page 829.

instructions for tactical reasons, such reasons will not be presumed from counsel's failure to object to the instruction].)

Continuing to assume the instruction was improper we will further assume the error was not invited.

The error is subject to harmless error analysis. *People* v. *Odle* (1988) 45 Cal.3d 386 [247 Cal.Rptr. 137, 754 P.2d 184] held the failure to instruct on an element of a special circumstance was not per se reversible error. (P. 415.) *Odle* reaffirmed (at pp. 410-411) the *"Cantrell-Thornton"* exception to the reversible per se standard in cases where ". . . the parties realized the element was in issue, presented all the evidence at their command on the issue, and the record both established the existence of the element as a matter of law and showed the contrary evidence not worthy of consideration . . ." (See *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256].) *Odle* also noted (at pp. 412-413) the federal Supreme Court has (since *Sandstrom*) indicated most errors will be subject to the harmless error rule because "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (*Rose* v. *Clark* (1986) 478 U.S. 570, 579 [92 L.Ed.2d 460, 471, 106 S.Ct. 3101] ; see *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918].) Because of this we disagree with *Burres* that we must view the error as reversible per se.

The parties were aware intent to commit battery was an issue in the case and presented all of the evidence at their command on it. The evidence showed beyond a reasonable doubt defendant intended to batter both Margareta and Tony and the only evidence opposed to this was defendant's testimony he tried to be gentle with Tony when (after violently breaking into Tony's house with a gun and announcing his intention to kill Tony's stepdaughter) he struggled with Tony and forced him to his knees. This contrary evidence is unworthy of consideration in deciding if defendant intended to batter Tony. No argument is made there was any evidence contradicting the evidence of defendant's intent to batter Margareta. Defendant's own testimony was after bursting into the house at gunpoint he pushed her aside with the rifle while declaring his desire to kill Magdelena. As a matter of law defendant assaulted these two victims. We find any arguable uninvited error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

IV, V*

. . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Within 20 days of the filing of this opinion, the People may file a request with this court for modification of the judgment reducing the offense of attempted murder to attempted voluntary manslaughter in violation of Penal Code section 664. Such a statement shall not affect any then pending application for rehearing. Should such a statement be filed, the remittitur will direct said modification, affirm the judgment as so modified and instruct the trial court to resentence defendant for first degree burglary, attempted voluntary manslaughter, assault with a firearm (two counts), disobeying a domestic relations court order (misdemeanor), and for using a firearm in the commission of the burglary and attempted voluntary manslaughter after appropriate proceedings under the probation statutes. Should such a statement not be filed, the remittitur will order reversal of the conviction on count II.

Evans, Acting P. J., and Carr, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 26, 1990.

---

* See footnote, *ante,* page 829.