[Crim. No. 22379. Dec. 23, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE LEON FUENTES, Defendant and Appellant.

**COUNSEL**

David W. Steuber, under appointment by the Supreme Court, Paul W. Cane, Jr., Grace A. Carter, John A. O'Malley, Paul, Hastings, Janofsky & Walker, Quin Denvir, State Public Defender, Michael G. Millman and Donald L. A. Kerson, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Norman H. Sokolow, Carol Slater Frederick and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.; see Pen. Code, § 1239, subd. (b).)[1]

A jury convicted appellant of first degree murder (§§ 187, 189), attempted robbery (§§ 664, 211), and automobile theft (Veh. Code, § 10851). It found true the special circumstance that the murder was committed during the attempted commission of a robbery (§§ 190.2, subd. (a)(17)(i), 664/211) and the allegation that appellant personally used a firearm in the commission of the attempted robbery and the murder (§ 12022.5). Following a penalty phase hearing at which both sides presented evidence, the jury fixed the penalty at death.

Appellant raises three claims of error regarding the guilt and special circumstance phase of his trial. He contends the trial court's refusal to allow him to ask certain questions at voir dire violated the guidelines set out by this court in *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869]. He further argues that the special circumstance finding must be set aside under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826].[2] The first argument, even if meritorious, would require reversal only of the special circumstance finding. That finding must be set aside in any event due to *Carlos* error, as the *Garcia* exceptions to the rule of per se reversal are inapplicable here. Absent a valid special circumstance finding, the judgment of death must be reversed.

### I.

*Guilt and Special Circumstance Phase Evidence*

On the afternoon of December 1, 1980, two armed men, appellant Jose Leon Fuentes and an accomplice, attempted to rob a Brinks guard, Paul

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

[2]The third claim of error, that the felony-murder rule is invalid, was resolved in this court's opinion in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].

Martinez, as he left the cashier's office of a department store carrying approximately $85,000 in a Brinks bag.

After picking up two days' receipts from the cashier's office, Martinez came through an inner doorway which separated the cashier's office area from the main shopping floor, and headed toward the store's outside exit. The two men approached him. Gunshots were fired, and both appellant and Martinez fell wounded to the floor. Martinez died of gunshot wounds to the chest. Appellant was arrested at the scene. The accomplice escaped and was never apprehended.

Martinez's partner, Lucky Springer, was waiting outside in an armored truck. Martinez carried a pocket transmitter by which he could communicate with Springer. The transmitter was on, and Springer could hear Martinez talk with the cashier as he picked up the receipts. After hearing Martinez say goodbye to the cashier, Springer heard the background noise of people talking and children's voices. Next, he heard nine or ten gunshots. At trial, he estimated that the shots were fired within three or four seconds after Martinez left the cashier.

Thirteen other witnesses—including eight department store customers and five employees—testified at the trial. Four customers and two employees saw some or all of the shooting. The remaining witnesses heard the sequence of gunshots, or saw some movements of appellant and an unidentified accomplice before and after the shooting. According to all witnesses, the entire incident lasted only a few seconds. The major discrepancy among the witnesses' accounts was whether appellant or his accomplice had fired the fatal shots.

Linda V. was three or four feet from the commotion and had an uninterrupted view of it. Thus, her testimony provided the clearest account of the shooting and was the strongest evidence that appellant had fired. At the time of the shooting, Linda was in the customer service area exchanging a purchase. The customer service office is in the same area as the cashier, off the main shopping floor. Linda was accompanied by several young children. As Martinez emerged from the cashier's office carrying the Brinks bag on his left arm, the children ran up to him and asked what he had in it. Linda called them back, and Martinez proceeded through the doorway from the customer service and cashier's area out to the shopping floor.

When she first entered the customer service/cashier area, Linda had seen the accomplice, a black man in light clothing, just outside the doorway. The accomplice would have been on Martinez's right as Martinez exited. As Linda watched Martinez go through the doorway, she saw appellant ap-

proach Martinez from the left and appear to embrace him. She also saw the accomplice approach Martinez. According to Linda, appellant attempted to pull the Brinks bag out of Martinez's hands. Shots rang out and Martinez fell backwards. Appellant fell a moment later. Linda caught a quick glimpse of the accomplice and called to her companions, who were outside the doorway in the shopping area, to run for cover. As she yelled, Linda pulled the children out of the way.

Linda's testimony was corroborated by two other witnesses, Katie H., a ten-year-old girl, and Lisa W., a salesperson. Each testified that appellant shot Martinez. However, their identifications of appellant as the triggerman were less convincing than Linda's. Katie testified that she recognized appellant as the gunman because she had seen his picture in the newspaper. Lisa admitted that she had dropped to the floor behind a counter when she heard the shots, and was therefore unable to give any description of the gunman to the police at the scene.

Two witnesses believed that the accomplice, rather than appellant, shot Martinez. Linda V.'s sister, Martha F., and a friend, Laurie B., were standing at a shoe display table near the customer service doorway when the shots rang out. They saw Linda at the doorway yelling at them to get on the floor. Because they were concerned for their children, who were with Linda, they continued to look towards the customer service area.

Martha saw Martinez and appellant fall to the floor. She watched the accomplice bend over them and apparently fire a few shots. The accomplice held a gun, and Martha could see his hands recoil as she heard shots. However, Martha did not witness the entire incident, since at some point during the shooting she and Laurie ducked behind a display table.

Laurie also testified that she saw the accomplice bend over as his hands recoiled. She did not see Martinez or appellant until the shooting was over. Presumably, both Martinez and appellant were already on the floor when Laurie looked in their direction.

The testimony of Todd B., a salesman, also supported the theory that the accomplice rather than appellant was the actual assailant. Todd looked in the direction of the customer service area when he heard the shots. He saw Martinez fall and saw the accomplice near him. The accomplice appeared to be shooting, and Todd could hear gunshots during this time. Todd saw appellant fall to the floor a few seconds after Martinez. However, Todd, like Martha and Laurie, ducked as soon as he heard the shots, so he did not have an uninterrupted view of the entire incident.

In all, seven witnesses testified to having seen the accomplice in the store near the time of the shooting. Though there were some discrepancies concerning the accomplice's height and headgear, all witnesses gave a fairly consistent description of a black man wearing a white or very light tropical suit. Several of the witnesses saw this man walk out of the store at a rapid pace shortly after the shooting. Katie H. saw him place a gun on the shoe display table as he was leaving. This gun was recovered by police investigators later that day.

The manager of the cashier's office came out of the customer service area immediately after the shooting. He saw appellant and Martinez on the floor. A gun lay on the floor six inches from appellant's hand. The manager kicked the gun away toward Martinez.

Expert testimony established that five shots had been fired from that gun. The sixth cartridge in the gun had been struck but failed to fire. Five shots had also been fired from Martinez's gun.[3] None of the cartridges found in the store had been fired from the gun which Katie saw the accomplice leave on the shoe display table. Ballistics tests indicated that bullets found in Martinez's body had been fired from the gun found near appellant.

Car keys found in appellant's pocket proved to fit a Chrysler Cordoba parked in the department store parking lot. The Cordoba had been stolen fairly recently from a Manhattan Beach automobile dealer.

The defense theory was that the accomplice, rather than appellant, shot Martinez. Appellant argued that he had done nothing more than aid and abet a robbery and had no intent to kill Martinez. This argument was based on the testimony of the prosecution witnesses who believed that they had seen the accomplice fire a gun, and on one defense witness, a store customer who saw the accomplice walk rapidly away from the scene of the shooting. Appellant did not testify.

*Penalty Phase Evidence*

At the penalty phase, it was stipulated that appellant had suffered five prior robbery convictions, four in 1969 and one in 1975. In each robbery he was personally armed with a pistol. He served two separate prison terms for these convictions.

The defense offered the testimony of W. L. French, appellant's former correctional counselor at Folsom Prison. Mr. French testified about appel-

---

[3]Martinez's gun could carry six bullets. However, Martinez's partner testified that it was the practice of Brinks guards to carry their guns loaded with only five bullets, leaving an empty chamber under the firing pin.

lant's exemplary academic and work record in prison. Appellant, who had fled to the United States from Cuba in 1963, spoke very poor English and read at a second grade level when he enrolled in the prison school program in 1976. Within two years, he was reading at fifth grade level. His work performance was above average, and he was eventually assigned to supervise other inmates. He had no disciplinary infractions during his second prison term. The records from his first term reflected only one minor infraction, arising from an incident where he thought another inmate had taken his eyeglasses.

Appellant's cousin, Urbano Rosales, testified that appellant had been a "good person" when they were growing up together in Cuba.

Rosales came to the United States in 1964, and settled in Miami. He did not see appellant again until 1980, when appellant stayed with him for several months while looking for work. During that period, appellant worked at several temporary jobs in Miami, and assisted Rosales as a refrigerator mechanic. At the end of 1980, appellant returned to Los Angeles because he could not find a job in Florida.

## II.

The defense theory at trial was that appellant neither shot Martinez nor intended that he be shot. At most, the defense argued, appellant intended to participate in a robbery.

 At the outset of voir dire, counsel informed the trial court that he wished to question the prospective jurors as to whether they believed a robbery accomplice who does not kill should be punished as severely as an intentional killer. Accordingly, counsel submitted for the court's approval the following question: "Do you believe that one who only aids and abets the commission of an attempted robbery and does not intentionally aid and abet the actual killing during the commission of said attempted robbery should be treated under the law in the same fashion as the actual killer?"[4]

The trial court agreed that if the evidence indicated the attempted-robbery special circumstance allegation was premised on an aiding and abetting the-

---

[4]Counsel also submitted three follow-up questions. The first of these quoted the instruction which the trial court would give as to the attempted robbery-murder special circumstance. The instruction, CALJIC No. 8.80 (4th ed. 1980 rev.), as modified by the trial court, made clear that the special circumstance could be found true only if the jury found either that appellant was the actual killer, or that with the intent to kill he aided and abetted the killer.

The last two questions concerned the prospective jurors' understanding that this instruction would have to be followed.

ory, the jury would be instructed to find an intent to kill in order to sustain it. However, counsel was not permitted to ask his proposed questions. The court found the questions were "confusing" because they failed to focus clearly on the issue of intent. It also found they were "inappropriate" under *People* v. *Williams, supra,* 29 Cal.3d 392, since they did not concern an issue of widespread public knowledge or controversy.

■ In *Williams,* this court held that counsel may make reasonable inquiries on voir dire to intelligently exercise peremptory challenges. *(Williams, supra,* 29 Cal.3d at p. 407.) "[C]ounsel should . . . be allowed to inquire into 'matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact.' [Citation.]" *(Id.,* at p. 408.) This rule applies to inquiries about controversial rules of law which may be applied at trial. "[A] reasonable question about the potential juror's willingness to apply a particular doctrine of law should be permitted when from the nature of the case the judge is satisfied that the doctrine is likely to be relevant at trial." *(Id.,* at p. 410.)

■ Though they were confusing, the questions did incorporate a legal doctrine which appeared likely to be relevant to the special circumstance and to the penalty decision. The accused's intent to kill would be placed in issue by the special circumstance allegation and would be a relevant factor at the penalty phase. Counsel needed to know a prospective juror's views on whether such intent should always be required before the law's most extreme penalties may be imposed in order to exercise intelligently his peremptory challenges.

Furthermore, the proposition that the death penalty may not be imposed absent an intent to kill has been a subject of some controversy, as indicated by the United States Supreme Court's decision in *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]. That opinion's review of state laws authorizing the death penalty in felony-murder cases showed that many states did not make an intent to kill a prerequisite for capital punishment. *(Id.,* at pp. 789-793 [73 L.Ed.2d at pp. 1146-1149].) For these reasons, the trial court should have permitted counsel to question prospective jurors on this subject. ■ ■ ■ ■ If the court's concern was that the specific questions which counsel proposed were confusing, argumentative, or repetitious, it could have required him to rephrase or condense them. (See *People* v. *Fields* (1983) 35 Cal.3d 329, 358 [197 Cal.Rptr. 803, 673 P.2d 680].)[5] By ruling that the entire area of inquiry was "inappro-

---

[5]*Williams* left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits. [Citations.] Under this standard, trial courts need not and should

priate," the court deprived counsel of the opportunity to meet any objections based on the form of the questions.

However, this error would compel at most a reversal of the special circumstance finding. ■ When a trial court restricts voir dire questioning concerning a particular doctrine of law, *Williams* concluded, "[r]eversal will be required . . . only if the doctrine is actually relevant, and the excluded question is found substantially likely to expose strong attitudes antithetical to defendant's cause." (*Williams, supra,* 29 Cal.3d at p. 410.) The requirement of an intent to kill was relevant only to the special circumstance finding since the murder charge was amply sustained on a felony-murder theory.

As the special circumstance finding must be reversed, it is not necessary to determine whether the court's exclusion of the proposed voir dire questions would provide an independent ground for reversal.

## III.

■ In connection with the special circumstance allegation, the jury was instructed that if appellant were not the actual killer but rather an aider and abettor, it would have to find that he "intentionally aided . . . the actual killer in the commission of the murder of the first degree with the specific intent to take a human life" in order to sustain that allegation. However, the court did not explicitly instruct the jury that it had to find an intent to kill if it believed that appellant was the actual killer. This omission was error under *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, whose holding governs this case. (*People* v. *Garcia, supra,* 36 Cal.3d at pp. 547-549.)

■ *Carlos* error requires reversal of the special circumstance finding unless one of four narrow exceptions is present. (*Garcia, supra,* 36 Cal.3d at pp. 549-556.) Of these four, only the *Cantrell-Thornton* exception need be considered as the others are clearly inapplicable.[6] That exception calls

---

not permit the inordinately extensive and unfocused questioning that prompted the adoption of the *Edwards* [*People* v. *Edwards* (1912) 163 Cal. 752 (127 P. 58)] rule. . . . [¶] . . . [T]he court need allow only *reasonable* questions—although it cannot exclude questions proper in scope, it is free to require that they be phrased in neutral, nonargumentative form." (*People* v. *Williams, supra,* 29 Cal.3d at p. 408.)

[6]Under the other three exceptions, *Carlos* error does not require reversal " 'if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted,' [or] 'if the defendant conceded the issue of intent.' " (*Garcia, supra,* 36 Cal.3d at p. 554, quoting *Connecticut* v. *Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969]), or if " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' " (*Garcia, supra,* 36 Cal.3d at p. 555, quoting *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

for affirmance in "cases where the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (*Garcia, supra,* 36 Cal.3d at p. 556, fn. omitted [relying on the standard drawn from *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 (105 Cal.Rptr. 792, 504 P.2d 1256) and *People* v. *Thornton* (1974) 11 Cal.3d 738 (114 Cal.Rptr. 467, 532 P.2d 267)]; see *People* v. *Anderson* (1985) 38 Cal.3d 58, 61 [210 Cal.Rptr. 777, 694 P.2d 1149].)

▇▇▇ The *Cantrell-Thornton* exception does not save the special circumstance finding here because there is no showing that the parties recognized that an intent to kill was in issue.

The record establishes that the prosecution, the defense and the trial court were all operating under the assumption that if defendant fired the fatal shots—as much of the evidence appeared to suggest—his intent to kill was irrelevant to the special circumstance finding. Indeed, the prosecutor emphasized this point explicitly in his closing argument to the jury: "If you find that the defendant pulled the trigger and shot one bullet into Paul Martinez, there is nothing more to discuss. This is the special circumstance; that he pulled the trigger. . . . You can say to Dooms Day that intent was not to kill; and it doesn't amount to a hill of beans. . . . So you would have felony murder. He pulled the trigger; special circumstance. Case over."

Appellant's entire trial strategy was based on the assumption that intent to kill would be in issue only if it were established that he was not the triggerman. Thus, counsel concentrated on attempting to raise a reasonable doubt as to who did the actual shooting. He simply had no incentive to attempt to show that even if appellant did fire the shots he did not intend to kill the Brinks guard, because no one thought that intent to kill would be relevant in that situation.

Accordingly, the first prerequisite to the application of the *Cantrell-Thornton* exception is missing here. As *Garcia* emphasized: "If the defendant in a pre-*Carlos* trial was unaware that intent to kill was an element of the felony-murder special circumstance, he might through ignorance fail to present evidence worthy of consideration on that matter. We could not in such cases affirm a special circumstance finding on the ground that defendant did not introduce evidence sufficient to raise a material issue." (36 Cal.3d at p. 556.)

Had counsel realized that the special circumstance required an intent to kill, he might well have put forth a defense which conceded that appellant

was the triggerman but argued that there was no intent to kill. That theory would have been more consistent with the eyewitness testimony. The evidence that the accomplice shot Martinez was weak. The witnesses who offered it—Martha, Laurie, and Todd—were some distance from the shooting. Their testimony that the accomplice's hands recoiled as he bent over Martinez was explained away by the prosecutor, who theorized that the accomplice was trying to pull the Brinks bag away from Martinez.

In contrast, the theory that appellant shot Martinez was more forcefully supported by eyewitnesses, particularly Linda, who saw the shooting from a distance of three or four feet. Also, it was far more consistent with the expert testimony that Martinez was killed by the gun which was found near appellant, not the gun which the accomplice left on the display table.

Yet even assuming appellant was the triggerman, a finding of an intent to kill was by no means a foregone conclusion. Obviously, the guard was not shot to eliminate a witness to the robbery. The department store was filled with eyewitnesses. Appellant might have testified and the jury might reasonably have found that the shots were fired with the intent to wound the guard—so that he would release the money bag—or to immobilize him—so that the robbers could make their escape. Appellant might also have shot as a reflexive reaction (see *People* v. *Newton* (1970) 8 Cal.App.3d 359, 370 [87 Cal.Rptr. 394]), particularly if Martinez shot first, a possibility not ruled out by the eyewitnesses. In this setting, multiple shots fired during a scuffle cannot establish intent to kill as a matter of law.

Because counsel had no incentive to explore this defense based on the facts, the *Cantrell-Thornton* exception is inapplicable and the special circumstance finding must be reversed.[7] Since there is no other valid special circumstance finding, the penalty of death must also be reversed.

### IV.

The court's restriction of voir dire questioning, even if erroneous, was prejudicial only as to the special circumstance finding. That finding must be set aside due to *Carlos* error, since none of the four *Garcia* exceptions to the rule of per se reversal applies.

---

[7]The Attorney General's argument that the defense conceded the issue of intent (see *Garcia, supra,* 36 Cal.3d at p. 554) must also be rejected. This argument is based on counsel's pretrial comment that "I would assume now the person who was the shooter intended to kill Mr. Martinez." That comment was made at a time when counsel thought intent to kill was irrelevant if defendant was the triggerman. Thus, in reality counsel was not conceding anything. To treat that remark as a formal concession on the issue of intent is totally inconsistent with *Garcia*'s conclusion that an accused in a pre-*Carlos* trial should not be prejudiced for failing to anticipate the *Carlos* decision.

Accordingly, the judgment is affirmed as to guilt. The special circumstance finding is set aside, and the judgment imposing a penalty of death is reversed.

Broussard, J., Reynoso, J., and Kaus, J.,* concurred.

**GRODIN, J.,** Concurring.—Without speculating as to what appellant "might have testified," I agree that the record in this case does not establish the requisite intent as a matter of law. I therefore join in the judgment.

**LUCAS, J.,** Concurring and Dissenting.—I concur with the majority opinion to the extent it affirms defendant's conviction of first degree murder and other lesser offenses. I dissent, however, to the setting aside of the special circumstances finding and reversal of the judgment of death.

The majority relies upon *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in concluding that the failure to instruct the jury regarding intent to kill was prejudicial error requiring us to set aside the special circumstances finding. For reasons I have previously explained, I strongly disagree with the holdings in those cases. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [205 Cal.Rptr. 810, 685 P.2d 1161] [dis. opn.].) But even if these cases were correctly decided, they do not require setting aside the special circumstances finding here.

As the majority explains, under the evidence in this case defendant was either the actual killer or an accomplice. If he was an accomplice, the jury was specifically instructed that an intent to kill was a prerequisite to a special circumstances finding, thereby satisfying *Carlos'* demands. If he was the actual killer, an intent to kill was demonstrated as a matter of law by his act of firing five shots at point blank range into the chest area of the Brinks guard, victim Martinez. (A sixth cartridge had been struck but failed to fire.) No contrary intent evidence worthy of consideration was submitted by defendant. Accordingly, any *Carlos* error under the "actual killer" theory was clearly harmless. (See *Garcia, supra,* 36 Cal.3d at p. 556.)

The majority nonetheless speculates that defendant might have presented available evidence negating an intent to kill had he realized that such an intent was required even as to the actual killer. To the contrary, it is simply inconceivable that any such evidence existed, for if it did, defendant had a dual incentive to present it. First, such evidence was *crucial* in the event

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

the jury determined that defendant was merely an accomplice rather than the triggerman, a hotly disputed issue at trial. As indicated above, the jury was specifically told that an intent to kill was required in order to sustain the special circumstances allegation against an accomplice.

Second, lack of an intent to kill would have been a strong mitigating factor at the penalty phase of the trial. (See Pen. Code, § 190.3, subds. (a) [circumstances of the crime], (d) [extreme mental or emotional disturbance], (f) [reasonable belief killing was justified], (g) [extreme duress], (h) [impaired capacity to appreciate criminality of conduct or conform to law], and (k) [any other extenuating circumstance].) Yet, as the majority observes, defendant's penalty phase evidence was limited to general character and background evidence. Can there be any reasonable doubt whatever that defendant would have presented evidence bearing on his lack of intent to kill had there been any such evidence to present?

My colleagues continue to reverse capital cases on *Carlos/Garcia* grounds despite the fact that in most of these cases it is readily apparent that the defendant possessed the requisite intent to kill, and that a failure to instruct on that issue was, at worst, harmless error.

I would affirm the judgment.

**MOSK, J.,** Concurring and Dissenting.—I concur in affirming the judgment as to guilt, but dissent from the reversal of the special circumstance finding. I would sustain that finding for the reasons stated in the third and fourth paragraphs of the concurring and dissenting opinion of Justice Lucas in this case.