[No. A044340. First Dist., Div. Two. Mar. 8, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DERRICK BARBOSA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III A-D.

**COUNSEL**

Jeffrey Schafer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Catherine Rivlin, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KLINE, P. J.—**

## I. STATEMENT OF THE CASE

A two-count information filed in the Alameda County Superior Court on June 3, 1986, charged appellant and Wayne Winchester with the murder

(Pen. Code, § 187) and robbery (Pen. Code, § 211) of John Fontanot. As to the first count, the information alleged as a special circumstance against appellant that the murder was committed during the course of a robbery. (Pen. Code, § 190.2, subd. (a)(17)(i).) As to both counts, the information alleged that appellant had personally used a deadly and dangerous weapon (a knife) and had personally inflicted great bodily injury upon John Fontanot. On April 21, 1988, both great bodily injury clauses were stricken on the prosecutor's motion.

Appellant's trial was severed from Winchester's on March 7, 1988. Jury selection proceedings lasted from April 18 to June 20. The guilt phase of the trial began on June 27, and ended on July 25 with the jury's verdicts finding appellant guilty of first degree murder and robbery, and finding true the special circumstances and weapon use allegations.

On December 1, 1988, appellant's motion to dismiss the special circumstance was denied. On the murder count, appellant was sentenced to life imprisonment without possibility of parole, and a consecutive one-year term for the weapon use. For the robbery count, appellant was sentenced to the upper term of five years and a consecutive one-year term for the weapon use. The terms imposed for the robbery count were ordered stayed pending completion of service of the sentence on the murder count. Appellant was further ordered to pay a restitution fine of $100.

Timely notice of appeal was filed on December 1, 1988.

## II. STATEMENT OF THE FACTS

On January 13, 1985, the body of John Fontanot was found lying in the parking lot of the Dag Hammerskjold School in Oakland. Fontanot's fiancée, Guila Rantz, testified that he spent the previous evening at her home. On the morning of January 13 Fontanot left intending to buy Super Bowl tickets. He had approximately $2,000 in cash with him.

When Rantz last saw Fontanot he was wearing numerous pieces of jewelry. Rantz described a ring in the shape of a fox, which had red stones and another ring the size of a silver dollar that had 23 diamonds in it. Fontanot also was wearing three chains, one of which bore the cursive letter "F" with six or seven diamonds in it. Another chain had a large medallion on it. Rantz admitted that Fontanot drank "all the time" and had a violent temper.

Herb Duley, an investigator for the Alameda County Coroner's Office testified that no rings were found on Fontanot's body. He also testified that

he found one gold chain on Fontanot's back near his buttocks and another around his face with a gold medallion on it. He found approximately $21 in cash on the body. Duley estimated that, based on the degree of rigor mortis, Fontanot had been dead for approximately four hours by the time he arrived at the scene.[1]

Anthony Ruggiero of the Oakland Police Department testified that on the day after the killing he went to the police storage area to examine a black Cadillac involved in this case. Inside the car he found a wallet with no money. In all, he was able to recover eight fingerprint lifts—seven from the car and one from a paper cup at the scene of the crime. Additional fingerprints were taken from orange juice bottles found in the Cadillac and from a white Buick thought to be involved in the matter. Of these prints only one, taken from an orange juice bottle, was useful for identification purposes. That print matched the prints of the victim, John Fontanot.

Dr. Paul Herrmann testified regarding the autopsy of the victim, which was performed by his partner Dr. Rogers. He explained that John Fontanot died of multiple stab wounds, primarily around his neck and upper back.[2] Dr. Herrmann stated that while all of the wounds contributed to the death, one wound alone, which entered the chest and lung, probably would have been fatal. He further testified that it was impossible from the autopsy to determine the order the wounds were inflicted, the position of the body during the attack, when the victim died, and whether one or more weapons were used during the attack.

Officer Jerry Harris of the Oakland Police Department served a search warrant at appellant's home on January 17, 1985. He recovered two pairs of pants (one denim and one corduroy) and two black jackets. The blood found on the corduroy pants and one of these jackets was consistent with the victim's blood, which is found in .008 of the population.

Leonard Feathers, who admitted three felony convictions, testified for the prosecution. Rodney Fuller, Wayne Winchester, appellant and Feathers were all neighbors in Oakland. Feathers spent the evening of January 12, 1985, at Fuller's house using drugs and drinking.

At approximately noon the next day appellant appeared at Fuller's house with a white man. Appellant went into the kitchen while the white man went to the bathroom. Appellant said, "He got two thousand. Do you want to get it?" Feathers declined the invitation, explaining he was not a robber.

---

[1] The pathologist later testified that while rigor mortis may give some clue as to the time of death it cannot be used as an accurate indicator of the time of death.

[2] The autopsy revealed 22 separate stab wounds.

Appellant went over to the counter near the sink and appeared to tuck his shirt into his pants. When appellant walked away from the counter the knife that previously had been lying there was gone. Appellant and the white man left in a black Cadillac.

Feathers testified that the white man was wearing "a lot" of rope chains and diamond rings and a big medallion with the letter "F" in it. He also noticed he was wearing a diamond watch. Appellant was wearing black pants, white tennis shoes and a black jacket.

After appellant left Feathers began walking toward Winchester's house and met him along the way. He saw appellant leave a black Cadillac parked near Winchester's house and walk toward them. Winchester joined appellant in the Cadillac and drove off. According to Feathers, the next time he saw the white man he was lying dead in the Dag Hammarskjold schoolground.

On cross-examination Feathers admitted that at the preliminary examination he testified he did not recognize the person lying in the schoolyard. He also admitted he previously had reported appellant was wearing blue jeans and a reversible beige-colored coat, rather than all black, on the day of the murder. Feathers acknowledged he had ingested a substantial amount of drugs and alcohol on January 12 and was still feeling the effects of those substances the next day, when Fontanot was killed. On the morning of January 13 he drank some Night Train wine and was somewhat intoxicated by the time appellant arrived. According to Feathers, on the day of Fontanot's murder appellant appeared to be under the influence of cocaine because "his eyes were real big and he was acting real speedy."

Feathers admitted that Wayne Winchester's brother, Steve, who had a reputation for violence, had threatened to kill him if he testified against Wayne and appellant. Feathers further testified that Sergeant Vargas, who was in charge of the murder investigation, told him he would end up in jail if he didn't testify against appellant.

Feathers had known Rodney Fuller a long time and claimed Fuller had "mental problems." According to Feathers, Fuller sometimes "just stands in the middle of the street and just fights the wind and just talks to his self." Fuller also punches telephone poles and paints his trees.

Rodney Fuller testified for the prosecution after admitting his prior convictions for robbery and auto burglary. He admitted that he has worked as a police informant for many years and had been paid "thousands of dollars" for information he had given to the police.

According to Fuller, on January 13, 1985, he was standing at the kitchen counter making a salad when appellant arrived with a white man. Fuller recalled the white man was wearing a couple of gold chains with a pendant with the letter "F" and a medallion. Appellant asked Fuller where the chain saws were; Fuller told him he didn't know anything about chain saws. Appellant then asked where Wayne Winchester was, but Fuller didn't know. The white man went into the bathroom and appellant went into the kitchen where Feathers was sitting. Appellant said the white man had $2,000 he wanted; he asked Fuller if he wanted to accompany him, but Fuller refused. When the white man came out of the bathroom he and appellant immediately left. The knife Fuller had been using to make the salad was gone; Feathers told him appellant had taken it. At trial Fuller admitted he previously testified he believed appellant was trying to pull a scam involving chain saws on the white man, who appellant thought was a sucker.

About an hour later Fuller saw a man lying dead in the bushes in the schoolyard; he looked like the white man who had been at his house with appellant earlier that day. Fuller identified the bloodied clothing in evidence as the clothing worn by Fontanot that day.

Claudis Jefferson grew up with appellant and, at the time of trial, was incarcerated in the Alameda County Jail where appellant was being held. Jefferson was serving a sentence for robbery and admitted numerous prior convictions for burglary, car theft, possession of narcotics, and receiving stolen property.

Jefferson testified that while he and appellant shared a jail cell in Santa Rita County Jail appellant bragged about committing a murder and a robbery. Appellant told Jefferson he had used a knife to kill a man for some money and jewelry and asked Jefferson to kill Rodney Fuller and Leonard Feathers to prevent them from testifying against him. In September 1985 Jefferson told the police about appellant's proposal. According to Jefferson, he received no money or promises in exchange for his testimony; however, the police did agree to have him serve his prison time out of state because Jefferson feared he would be killed for testifying. On cross-examination defense counsel highlighted inconsistencies between Jefferson's trial testimony and prior statements to the police and at the preliminary hearing.

Ralph Lacer and John Vargas were the Oakland police officers assigned to investigate the Fontanot murder. On January 17 Sergeant Vargas received a phone call from appellant who claimed he knew nothing regarding the murder. Appellant nonetheless agreed to talk to the police; Sergeant

Vargas assured him, "[a]ll I need to do is get a quick statement from you . . . and then we should have you on your way."

Appellant presented several different explanations of his activities on the day of the murder.[3] In his first statement to the police appellant asserted he stayed home on Saturday night, January 12, got up at approximately 8 a.m. Sunday and left to play basketball around noon. Appellant claimed his curiosity was aroused when his dog, which was running off its leash, did not respond to his calls. When appellant investigated he saw the dog sniffing the victim's body and a black Cadillac parked nearby. Appellant first stated the victim was "shaking like a leaf," but then claimed he was dead. He told the officers that he briefly went to a friend's house looking for help; when he returned the car was gone.

Officer Lacer told appellant there were implausible or inconsistent parts of his story; appellant nodded but did not reply. The officers then moved appellant to another interview room, deliberately walking him past the office where Leonard Feathers was waiting to be interviewed. Soon thereafter appellant gave a second statement to the police.

Appellant began by admitting his first statement was not true. Appellant claimed that at approximately noon on January 13 he went to the Foster Freeze but was a nickel short on his bill. According to appellant, a short white man wearing a lot of gaudy jewelry approached him and offered to pay the entire bill. The man asked appellant to sell drugs for him and placed a large bundle of cash on the table. According to appellant's estimate, the man had approximately $2,000 or more.

Appellant and the white man went to Fuller's house and saw Feathers and Fuller there. Appellant told the officers he intended to cheat the white man out of $500 by claiming he was going to buy him chain saws from Wayne Winchester. The white man refused to give appellant the money and appellant "cut him loose." Appellant briefly stopped at Winchester's house and then went home. Appellant first maintained he did not return to the schoolyard that day, but later admitted he went to the schoolyard and saw the white man lying dead.

After the conclusion of the second statement Sergeant Lacer told appellant he did not believe his story. The officers left appellant for five minutes and returned to play a portion of the statement Rodney Fuller had given the police. Appellant then stated, "I was there, but I didn't kill him. We just

---

[3] These statements were tape-recorded and played for the jury. Transcribed versions of the statements were also provided to the jury and included in the record on appeal.

intended to rob him." The officers showed appellant his coat, apparently stained with blood. Appellant told them there were ways blood could have gotten on his coat despite the fact that he was not involved in the murder. Appellant later told the officers he would be willing to testify against Winchester if they "let him walk." Appellant was arrested soon thereafter.

*The Defense*

The defense testimony attempted to undermine the credibility of Claudis Jefferson and to suggest that Wayne Winchester had killed Fontanot.

Billy Richards testified that on the day of the murder he saw appellant and Winchester in a black Cadillac driven by a white man. Later that day he again saw Winchester and noticed he had blood on his hands; he assumed the blood was from a stitched wound on Winchester's hand. Richards also told the police that Winchester had a gold ring on the day of the murder.

Peter Dunbar, an officer in the Oakland Police Department, testified he spoke with Billy Richards on January 24, 1985. Dunbar confirmed that Richards told him Winchester's hands were "covered with blood" on the day of the murder, although Richards explained he believed the blood came from stitches on Winchester's hand.

The defense also tried to show Winchester displayed consciousness of guilt because he jumped from a window and fled when the police attempted to arrest him.

Lonnie Pope, who, at the time of trial, was an inmate in North County Jail, testified he lived in the same pod (or housing facility) with Claudis Jefferson for several months. Jefferson was known to be a prosecution witness and thus was disliked by the other inmates. Pope recalled Jefferson bragging he was going to testify against appellant and falsely swear to tell the truth. He further boasted the jurors were "suckers" and asserted you "can say . . . anything and they'll believe it."

### III.  DISCUSSION

A.-D.*

. . . . . . . . . . . . . . . . . . . . .

---

* See footnote, *ante,* page 1619.

## E. *Proof of Intent to Kill*

■ John Fontanot was killed on January 13, 1985, after the decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (proof of intent to kill or aid in a killing is essential to sustain a conviction of a felony-murder special circumstance), and before *Carlos* was partially overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (proof of intent only required where defendant is an aider and abettor). Under *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418], in order to sustain the special circumstance finding in this case the prosecution was required to prove appellant intentionally committed the killing. At trial both the prosecutor and the defense attorney recognized intent was at issue if appellant acted as an aider and abettor. For example, the prosecutor explained that if the jury concluded appellant acted as an aider and abettor it could only find the special circumstance true if it determined he acted with intent to kill. He then argued, "[a]nybody at the scene of this crime who saw this going down didn't stop it, intended to aid in it." Similarly, appellant's attorney warned the jurors they could not find the special circumstance true if appellant participated as an aider and abettor and had no intent to kill.

However, the record proves both attorneys mistakenly believed *Anderson* applied retroactively and that intent was *not* an issue if the jury concluded appellant was the perpetrator rather than an aider and abettor. While discussing the challenged jury instruction with the court the prosecutor stated, "Under *Anderson* intent is no longer an issue in the felony murder if you're the killer." Defense counsel concurred: "No. Right." Appellant contends that because the jury was improperly instructed on the intentionality requirement the special circumstance finding cannot stand.

We previously concluded that we were bound to reverse the special circumstance finding by our supreme court's opinion in *People* v. *Fuentes* (1985) 40 Cal.3d 629, 640-641 [221 Cal.Rptr. 440, 710 P.2d 240].[12] At the

---

[12] In *Fuentes*, like the instant case, the court and the attorneys proceeded under the mistaken assumption that if Fuentes was the perpetrator his intent to kill was irrelevant to the special circumstance finding. The Supreme Court concluded that although the issue of intent was squarely raised with respect to Fuentes's liability as *an aider and abettor*, that did not satisfy the requirement under the *Cantrell-Thornton* exception (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 768-769, fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267]) that the parties "recognized that intent to kill was in issue." Justice Lucas wrote a separate concurring and dissenting opinion, joined by Justice Mosk, in which he disagreed with the majority's reversal of the special circumstance finding. He asserted that the evidence, which showed the killer fired five shots into the victim's chest at point blank range, demonstrated as a matter of law that the perpetrator acted with intent to kill. He further argued that despite the *Carlos* error Fuentes had a strong

People's request we granted rehearing to consider whether under *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918] and related California cases the special circumstance may be affirmed despite the instructional error. At our request appellant also filed a letter brief addressing this issue.

The United States Supreme Court has clearly concluded that certain instructional errors, such as that involved here, may be subjected to the "harmless beyond a reasonable doubt" analysis of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. In *Rose* v. *Clark, supra*, 478 U.S. 570, 574, the jury had been improperly instructed that "all homicides are presumed to be malicious . . ." in the absence of evidence to rebut the presumption. The Supreme Court granted certiorari to consider whether this instructional error could properly be analyzed under a harmless error standard. The court first observed that, "while there are some errors to which *Chapman* does not apply, they are the exception and not the rule." (478 U.S. at p. 578 [92 L.Ed.2d at p. 471].) Although the jurors in *Rose* were improperly instructed to presume malice from the predicate facts, the court emphasized that they still must have found the existence of those facts, and concluded, "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury." (478 U.S. at pp. 580-581 [92 L.Ed.2d at p. 472], italics in original.) The court continued, "[i]n that event the erroneous instruction is simply superfluous: the jury has found . . . 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." (478 U.S. at p. 581 [92 L.Ed.2d at p. 472], quoting *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068].) The court thus held that such errors may be reviewed under the "harmless beyond a reasonable doubt" standard of *Chapman* and suggested that reversal is not warranted where the evidence relevant to the erroneous instruction overwhelmingly points to the defendant's guilt.[13]

Similarly, in *Pope* v. *Illinois, supra*, 481 U.S. 497, where a jury was improperly instructed on the standard for determining the artistic or

incentive to present all evidence negating an intent to kill because such evidence was crucial in the event the jury determined he was an accomplice rather than the perpetrator.

In view of the obvious conflict between *Fuentes* and the subsequent Supreme Court opinions in *People* v. *Lee* (1987) 43 Cal.3d 666 [238 Cal.Rptr. 406, 738 P.2d 752] and *People* v. *Odle* (1988) 45 Cal.3d 386 [247 Cal.Rptr. 137, 754 P.2d 184], *post*, (which held harmless error analysis proper with respect to instructional errors), we can only conclude that either *Odle* overruled *Fuentes* sub silentio or that *Fuentes* must be limited to its facts. In either case, in view of the more recent Supreme Court decisions on this issue, we do not consider ourselves bound by the holding in *Fuentes*.

[13] In reaching this conclusion the court observed that where evidence of malice is overwhelming, "no rational jury would need to rely on an erroneous presumption instruction . . . ." (478 U.S. at pp. 581-582, fn. 10 [92 L.Ed.2d at p. 473].)

literary value of allegedly pornographic magazines, the court concluded that "if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand." (481 U.S. at p. 503 [95 L.Ed.2d at p. 447], fn. omitted.) In a footnote the opinion further noted, "[t]o the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, . . . after *Rose*, they are no longer good authority." (481 U.S. at p. 503, fn. 7 [95 L.Ed.2d at p. 447], citation omitted.)

Based on these federal authorities our Supreme Court also has held that a harmless error analysis is constitutionally permissible with regard to instructional errors whether the error relates to the elements of a substantive offense (*People* v. *Lee, supra,* 43 Cal.3d 666, 674-676) or a special circumstance finding (*People* v. *Odle, supra,* 45 Cal.3d 386, 410-415.)[14]

Appellant nonetheless argues a harmless error analysis is inappropriate where the erroneous instruction completely removes from the jury's consideration an element necessary for the offense or a special circumstance finding. In support of his position he cites *People* v. *Hernandez* (1988) 46 Cal.3d 194, 210 [249 Cal.Rptr. 850, 757 P.2d 1013], where the defendant was charged with and convicted of several general intent crimes. After trial the probation report mentioned for the first time the possibility of a three-year enhancement under Penal Code section 667.8 (for kidnapping for the purposes of rape.) Because the defendant had no notice of the mens rea required by section 667.8, and it was not mentioned in the information or at trial, the court concluded that, as a matter of due process, the enhancement could not stand. (46 Cal.3d at p. 208.)

The People argued reversal was unnecessary because the evidence clearly established the kidnapping was for the purpose of rape, and asserted that any error in the pleading, proof or instructions was harmless. The court rejected this claim, and focussed on the fact that, despite "substantial evidence" that Hernandez was intoxicated at the time the offenses were

---

[14] In *Lee* the jury received contradictory and partially inaccurate instructions regarding the specific intent to kill required to sustain a verdict of attempted murder. The Supreme Court nonetheless affirmed the conviction, concluding the error was harmless beyond a reasonable doubt. (43 Cal.3d at pp. 677-679.)

In *Odle* the jury was not instructed on the elements of the special circumstance allegation contained in the information (Pen. Code, § 190.2, subd. (a)(7) [killing of a peace officer while engaged in the performance of his duties].) The Attorney General conceded the error, but argued it was harmless. The Supreme Court determined, first, that the error was properly subjected to a harmless error analysis under *Chapman* and then concluded that, on the facts presented, the defendant could not have been prejudiced by the instructional error. (45 Cal.3d at pp. 410-416.)

committed, the jury had been instructed that voluntary intoxication was not a defense to the general intent crimes at issue. The court observed, "It is possible that defendant failed to testify or otherwise put on additional evidence as to his degree of intoxication and precise mental state at the time of the crimes because he believed, and rightly so, that voluntary intoxication was not a defense to the charges he faced. He did not know he faced a charge, the section 667.8 enhancement, which required proof of a specific mental state . . . ." (46 Cal.3d at p. 209, fn. omitted.) Under these circumstances, the court concluded that despite the convincing evidence regarding defendant's intent in kidnapping his victim, the error could not be deemed harmless.

*Hernandez* is distinguishable from the instant case. In that case it was apparent that the belated addition of the sentence enhancement raised a question of the defendant's specific intent where previously only general intent crimes had been involved. As the court recognized, under such circumstances, the defendant had no incentive to present evidence concerning his level of intoxication or other evidence relevant to a determination of whether he harbored the specific intent necessary for the enhancement.[15]

Appellant maintains he too might have presented other evidence if he knew intent to kill was at issue. For example, he asserts if he had been able to show that Wayne Winchester inflicted a substantial number of the wounds he could have undermined the evidence suggesting he intended to kill the victim. He further argues he might have been able to show the wounds were inflicted in an attempt "to persuade Fontanot to disengage from [an] ensuing struggle," and were not intended to kill him. We find these claims unconvincing. First, appellant offers no proof he actually had evidence available he did not present; his claims at this point amount to nothing more than speculation. Moreover, despite the instructional error

---

[15] Appellant also cites *People v. Lawson* (1987) 189 Cal.App.3d 741 [234 Cal.Rptr. 557] to prove the error here requires reversal. In *Lawson* the defendant was charged with violations of the corporate securities laws. Before trial the court informed the parties that it would instruct the jury that accounts receivable were "securities" within the meaning of the relevant statutes. In light of the court's ruling the defendant waived his right to a jury trial and subsequently was convicted by the court.

On appeal the court concluded the trial court had erred in its ruling, since the question of whether the accounts receivable constituted "securities" was a question for the jury. Further, the court reasoned this error could not be analyzed under a harmless error standard because "the trial court in this case *totally* deprived defendant Lawson of his right to jury trial on the element of 'security'." (189 Cal.App.3d at p. 754, italics in original.) In contrast, because intent was at issue here and the evidence overwhelmingly established appellant's intent to kill we cannot say appellant was deprived of his right to trial on this question. (See *Rose v. Clark*, *supra*, 478 U.S. at pp. 580-581 [92 L.Ed.2d at p. 472] [where the evidence conclusively establishes intent it may be said that despite an instructional error, the jury has found " 'every fact necessary' to establish every element" of the offense].)

appellant had a strong incentive to present such evidence if he indeed had it, since it not only undermined the inference of his intent to kill as a perpetrator, but was equally relevant to his culpability as an aider and abettor.

Thus, unlike the defendant in *Hernandez*, appellant had ample reason to disprove intent, if possible. The evidence at trial showed the perpetrator stabbed John Fontanot 22 times about his back and shoulders. In our opinion, it is virtually inconceivable that based on this evidence any reasonable jury could conclude appellant was the killer but had acted without the requisite intent.

Accordingly, although we find the trial court failed to adequately instruct the jury pursuant to *Carlos*, on the record presented we are satisfied the error was harmless beyond a reasonable doubt and that the special circumstance finding may stand.

## DISPOSITION

The judgment is affirmed.

Smith, J., and Benson, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 23, 1991. Broussard, J., was of the opinion that the petition should be granted.